[Cite as *Kinzel v. Ebner*, 2023-Ohio-164.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

| | |
|---|---|
| Judith A. Kinzel, Trustee, et al. | Court of Appeals No. E-21-036 |
| Appellees | Trial Court No. 2017 CV 0554 |
| v. | |
| Douglass Ebner, aka Douglas Ebner, et al. | |
| Appellants | |
| v. | |
| Richard L. Kinzel, et al. | **DECISION AND JUDGMENT** |
| Appellees | Decided: January 20, 2023 |

* * * * *

Michael Braunstein and Matthew L. Strayer, for Appellee,
Judith A. Kinzel, Trustee.

Charles A. Bowers, Stephen M. O'Bryan, and Mark E. Staib,
for Appellants.

Matthew L. Strayer, for Appellee, Richard L. Kinzel.

Frank H. Scialdone, for Appellee, City of Sandusky.

Robert J. Tucker, for Amicus Curiae, Ohio Realtors.

Christopher A. Holecek and Christina Sandefur, for Amicus
Curiae, Goldwater Institute.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Appellants, Douglass Ebner, 2253 Cedar Point LLC, and 2243 Cedar Point LLC (collectively "Ebner"), appeal the judgment of the Erie County Court of Common Pleas, which granted summary judgment in favor of appellee, the city of Sandusky ("the City"), on Ebner's counterclaims that Sandusky Ordinance Nos. 12-107 and 17-088 were invalidly enacted and were unconstitutional. For the reasons that follow, we affirm, in part, and reverse, in part.

## I. Facts and Procedural Background

{¶ 2} The underlying facts of this appeal are straightforward; the litigation history less so. This is the second time this case has been on appeal. In *Kinzel v. Ebner*, 2020-Ohio-4165, 157 N.E.3d 898 (6th Dist.), we set forth the facts and most of the arguments raised by the parties as follows.

{¶ 3} Ebner is the owner of single-family homes located on Lot 12 and Lot 13 of the Laguna Subdivision.[1] The homes are beachfront property, situated along the shore of Lake Erie, and are located on the Cedar Point Chaussee, which is a narrow strip of land that connects the Cedar Point Amusement Park peninsula to the city of Sandusky. Ebner acquired his properties in 2013 and 2015. He and his family reside in the home on Lot 12, but he offers it for short-term vacation rentals when he is out of town. Ebner uses Lot

---

[1] Appellant is the sole member of 2253 Cedar Point LLC, which owns Lot 12, and 2243 Cedar Point LLC, which owns Lot 13.

2.

13 almost exclusively for short-term vacation rentals. Lots 12 and 13 are located next to the amusement park.

{¶ 4} The litigation was initiated on October 31, 2017, when Ebner's neighbor, Judith Kinzel, filed a complaint against Ebner seeking injunctive relief and damages.[2] Kinzel alleged that Ebner's use of the properties for short-term rentals was in violation of deed restrictions as well as Sandusky Municipal Ordinance Nos. 12-107 and 17-088. Notably, two months earlier, the City had filed criminal charges against Ebner in Sandusky Municipal Court for violating Sandusky Municipal Code 1341.32, which prohibits transient rentals of property.

{¶ 5} Ebner filed a counterclaim against Kinzel, Kinzel's husband, and the City. Relevant here, Ebner's counterclaim against the City sought a declaration that Ordinance Nos. 12-107 and 17-088 were not validly enacted and were unconstitutional.[3] Further, Ebner claimed that the City's criminal enforcement action against him violated Equal Protection.

---

[2] Kinzel brought the action as Judith Kinzel, Trustee under the Judith A. Kinzel Trust Agreement (dated August 13, 1989, amended on June 25, 1997, amended on January 5, 1999, restated on January 17, 2002 and amended and restated on September 1, 2006 and amended on the 23rd day of October 2015). The Kinzel Trust owns the property adjacent to Ebner's.

[3] Although the City's enforcement action against Ebner is under the municipal code as enacted by Ordinance No. 17-088, Ebner contests the validity of Ordinance No. 12-107, because if that ordinance were rendered invalid, then Ebner's short-term rentals of his property would be permitted as a prior non-conforming use under Ordinance No. 17-088.

3.

**{¶ 6}** On April 22, 2019, the trial court entered its judgment on the parties' various competing motions for summary judgment. The trial court awarded partial summary judgment in favor of Kinzel on her ordinance violation claim, finding that judgment as to liability was appropriate, but reserving for the jury the issue of causation and damages. The trial court also awarded summary judgment to the City on nearly all of Ebner's counterclaims, finding that because the validity and constitutionality of Ordinance Nos. 12-107 and 17-088 were at issue in the criminal case against Ebner, and because the jurisdiction of the Sandusky Municipal Court was invoked first, the jurisdictional priority rule deprived the trial court of jurisdiction to rule on Ebner's claims. Alternatively, the trial court ruled that the City was entitled to summary judgment because the statutes were valid and constitutional. The court did find, however, that a question of fact remained as to Ebner's equal protection claim, and thus denied the City's motion for summary judgment on that claim.

**{¶ 7}** Ebner and Kinzel appealed and cross-appealed, respectively, the trial court's April 22, 2019 judgment. In *Kinzel v. Ebner*, this court affirmed the trial court's judgment, in part, and reversed, in part. *Kinzel v. Ebner*, 2020-Ohio-4165, 157 N.E.3d 898, at ¶ 2. This court affirmed the judgment as it pertained to the claims between Kinzel and Ebner. As to the claims between Ebner and the City, this court reversed the trial court's judgment that the jurisdictional priority rule deprived the court of jurisdiction to consider Ebner's challenge to the validity and constitutionality of Ordinance Nos. 12-107

4.

and 17-088. *Id.* at ¶ 87. However, this court did not reach the merits of the trial court's judgment that the ordinances were valid and constitutional because we sua sponte found that the judgment was not a final, appealable order. *Id.* at ¶ 90.

{¶ 8} Upon remand to the trial court, on February 8, 2021, the trial court reconsidered the City's motion for summary judgment on Ebner's equal protection claim. The court found that Ebner had failed to identify any other similarly situated landowners to which the ordinances applied but were not enforced. The court further found that Ebner presented nothing more than speculation and inferences that the criminal enforcement of the ordinances was motivated by malice unrelated to the City's official duties. Thus, the trial court awarded summary judgment to the City on Ebner's equal protection claim.

{¶ 9} Ultimately, the remaining claims between Kinzel and Ebner were settled and dismissed. All of the claims between the parties having been resolved, the trial court's April 22, 2019 judgment—holding that Ordinance Nos. 12-107 and 17-088 are valid and constitutional—is now final and appealable.[4]

## II. Assignments of Error

{¶ 10} Ebner has timely appealed the trial court's April 22, 2019, and February 8, 2021 judgments, and now presents three assignments of error for our review:

---

[4] On February 26, 2021, the trial court denied Ebner's motion to reconsider the April 22, 2019 judgment.

5.

1. The trial court erred when it dismissed Ebner's counterclaims against the City and denied its motion for summary judgment, holding that Sandusky Ordinance 12-107 ("2012 Ordinance") was validly enacted and constitutional.

2. The trial court erred when it dismissed Ebner's counterclaims against the City and denied its motion for summary judgment, holding that Sandusky Ordinance 17-088 ("2017 Ordinance") was validly enacted and constitutional.

3. The trial court erred in granting summary judgment against Ebner on its equal protection counterclaim against the City, finding that Ebner had not introduced evidence sufficient to create a genuine issue of material fact.

### III. Analysis

{¶ 11} We review the grant or denial of a motion for summary judgment de novo, applying the same standard as the trial court. *Lorain Natl. Bank v. Saratoga Apts.*, 61 Ohio App.3d 127, 129, 572 N.E.2d 198 (9th Dist.1989); *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Under Civ.R. 56(C), summary judgment is appropriate where (1) no genuine issue as to any material fact exists; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the nonmoving party, that

conclusion is adverse to the nonmoving party. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978).

{¶ 12} In his first and second assignments of error, Ebner argues that the trial court erred when it held that Ordinance Nos. 12-107 and 17-088 were validly enacted and were constitutional. Ebner organizes his argument by first addressing whether both of the ordinances were validly enacted, and then addressing whether both of the ordinances are constitutional. We will do the same.

## A. Whether the Ordinances Were Validly Enacted

{¶ 13} In his brief, Ebner argues that neither of the ordinances were validly enacted because the City failed to strictly adhere to the public notice and hearing requirements. The City responds that Ordinance No. 12-107 was validly enacted as an emergency measure, and that Ordinance No. 17-088 was validly enacted because the City substantially complied with the public notice and hearing requirements. We will begin with a brief, general discussion of the interplay between the Ohio Constitution, the Ohio Revised Code, and the City of Sandusky Charter. We will then apply those authorities to each ordinance in turn.

{¶ 14} Article XVIII, Section 3 of the Ohio Constitution provides that "Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." "[U]nder such powers of local self-

7.

government a municipality may enact ordinances relating to the subject of zoning."

*Morris v. Roseman*, 162 Ohio St. 447, 450, 123 N.E.2d 419 (1954), citing *Pritz v. Messer*, 112 Ohio St. 628, 149 N.E. 30 (1925). In *Morris*, the Ohio Supreme Court recognized two sources of authority for the way that municipalities may enact ordinances:

> By Section 2, Article XVIII,[5] a mandatory duty is placed upon the General Assembly to enact laws for the incorporation and government of cities and villages, and Section 7, Article XVIII,[6] grants a municipality the option of determining its own plan of local self-government by framing and adopting a charter. If a municipality adopts a charter it thereby and thereunder has the power to enact and enforce ordinances relating to local affairs, but, if it does not, its organization and operation are regulated by the statutory provisions covering the subject.

*Id.* The Ohio General Assembly has enacted legislation governing zoning procedure in R.C. 713.06, et seq. However, in this case, the City has adopted a charter controlling the manner in which ordinances may be enacted and enforced pursuant to its authority under Sections 3 and 7 of Article XVIII of the Ohio Constitution. Notably, as it pertains to

---

[5] Article XVIII, Section 2 of the Ohio Constitution provides, in pertinent part, "General laws shall be passed to provide for the incorporation and government of cities and villages."

[6] Article XVIII, Section 7 of the Ohio Constitution states, "Any municipality may frame and adopt or amend a charter for its government and may, subject to the provisions of section 3 of this article, exercise thereunder all powers of local self-government."

8.

zoning, the City's charter does not conflict with "general laws" because R.C. 713.14 expressly precludes the application of R.C. 713.06, et seq. to charter municipalities: "Sections 713.06 to 713.12, inclusive, of the Revised Code do not repeal, reduce, or modify any power granted by law or charter to any municipal corporation or the legislative authority thereof, or impair or restrict the power of any municipal corporation under Article XVIII of the Ohio Constitution." Therefore, the City's charter controls the zoning amendment process in this case.

{¶ 15} Finally, we note that the burden is on Ebner to demonstrate that the ordinances were not validly passed. "In the absence of evidence to the contrary, it is presumed that the procedure necessary to the legal adoption of legislation by a public legislative body has been followed." *Smith v. Juillerat*, 161 Ohio St. 424, 428, 119 N.E.2d 611 (1954), citing *City of Youngstown v. Aiello*, 156 Ohio St. 32, 37, 100 N.E.2d 62 (1951).

**1. Ordinance No. 12-107**

{¶ 16} In this case, the City enacted Ordinance No. 12-107 as an emergency measure. The issue presented by the parties centers on what is the substance and effect of an emergency measure. Four sections of the City's charter are pertinent:

[Section] 3 CITY COMMISSION. CREATION AND POWERS.

There is hereby created, commencing January 1, 1980, a City

Commission to consist of 7 electors of the City elected at large, each of

9.

whom shall be elected for a term of 4 years beginning January 1, after their elections, as hereinafter set forth.

* * *

All of the powers of the City, except such as are vested in the Board of Education and except as otherwise provided by this Charter or by the Constitution of the State, are hereby vested in the City Commission; and except as otherwise prescribed by this Charter or by the Constitution of the State, the City Commission may by ordinance or resolution prescribe the manner in which any power of the City shall be exercised. In the absence of such provision as to any power, such power shall be exercised in the manner now or hereafter prescribed by the general laws of the State applicable to municipalities.

[Section] 12 LEGISLATIVE PROCEDURE

* * * The affirmative vote of at least 4 of the members shall be necessary to adopt any ordinance or resolution; and the vote upon the passage of all ordinances and resolutions shall be taken by "yeas" and "nays" and entered upon the journal.

[Section] 13 ORDINANCE ENACTMENT

* * *

No ordinance or resolution of a general or permanent nature, or granting a franchise, or creating a right, or involving the expenditure of money or the levying of a tax, or for the purchase, lease, sale or transfer of property, unless it be an emergency measure or unless otherwise provided by this Charter, shall be passed until it has been read at 2 regular meetings not less than one week apart, or the requirement for such reading has been dispensed with by an affirmative vote of 5 of the members of the City Commission.

### [Section] 14 EMERGENCY MEASURES

All ordinances and resolutions passed by the City Commission shall be in effect from and after 30 days from the date of their passage, except that the City Commission may, by an affirmative vote of 5 of its members, pass emergency measures to take effect at the time indicated therein.

Any (sic) emergency measure is an ordinance or resolution for the immediate preservation of the public peace, property, health, or safety, or providing for the usual daily operation of a municipal department, in which the emergency is set forth and defined in a preamble thereto. Ordinances appropriating money may be passed as emergency measures, but no measure making a grant, renewal or extension of a franchise or other

11.

special privilege, or regulating the rate to be charged for its service by any public utility, shall ever be so passed.

{¶ 17} Ebner argues that the charter's "Emergency Measures" section only determines when the measure goes into effect. Ebner thus concludes that the City was still required to comply with the pre-adoption notice and hearing requirements for zoning legislation contained in Sandusky Municipal Code 1113.02, et seq., which were passed pursuant to the City's authority under Section 3 of the charter. The City, on the other hand, argues that the "Emergency Measures" section grants authority to pass substantive measures by the vote of five of the seven City Commission members. In effect, Ebner thinks of Ordinance No. 12-107 as a zoning ordinance with an emergency designation, whereas the City thinks of Ordinance No. 12-107 as an emergency measure pertaining to zoning. Based upon the language of the City's charter, we find the City's view to be correct.

{¶ 18} "The municipal charter is basically the constitution of the municipality." *Fuldauer v. City of Cleveland*, 32 Ohio St.2d 114, 118, 290 N.E.2d 546 (1972), quoting *Cleveland ex rel. Neelon v. Locher*, 25 Ohio St.2d 49, 51, 266 N.E.2d 831 (1971). "Municipal charters are to be so construed as to give effect to all separate provisions and to harmonize them with statutory provisions whenever possible. In the absence of circumstances requiring otherwise, language used in a municipal charter is to be

12.

construed according to its ordinary and common usage." *State ex rel. Paluf v. Feneli*, 69 Ohio St.3d 138, 630 N.E.2d 708 (1994).

{¶ 19} Upon review, we find that the charter recognizes "Emergency Measures" as a separate category of ordinances and regulations. Section 13 of the charter introduces the distinction between regular ordinances and resolutions and "Emergency Measures," when it states that "No ordinance or resolution of a general or permanent nature * * * *unless it be an emergency measure* or unless otherwise provided by this Charter, shall be passed until it has been read at two regular meetings not less than one week apart * * *." (Emphasis added.) Section 14 of the charter again recognizes a distinction in providing that "All ordinances and resolutions passed by the City Commission shall be in effect from and after 30 days from the date of their passage, *except that the City Commission may, by an affirmative vote of 5 of its members, pass emergency measures to take effect at the time indicated therein*." (Emphasis added.) Had the City's charter stopped there, we would be tempted to agree with Ebner that an "emergency measure" is simply a designation pertaining only to the effective date of the ordinance or resolution. However, Section 14 of the charter continues on, and defines what an emergency measure is: "Any (sic) emergency measure is an ordinance or resolution for the immediate preservation of the public peace, property, health, or safety, or providing for the usual daily operation of a municipal department, in which the emergency is set forth and defined in a preamble thereto." Section 14 further places limitations on the substantive content of emergency

13.

measures: "Ordinances appropriating money may be passed as emergency measures, but no measure making a grant, renewal or extension of a franchise or other special privilege, or regulating the rate to be charged for its service by any public utility, shall ever be so passed." Thus, because the charter distinguishes between ordinances and regulations of a general or permanent nature and emergency measures, and because the charter provides a substantive definition of emergency measures, we hold that the City's charter contemplates a separate category of substantive ordinances and resolutions known as "Emergency Measures." As such, emergency measures are not subject to the procedural requirements for zoning amendments contained in Sandusky Municipal Code 1113.02, et seq., pursuant to Section 3 of the charter, which states "*except as otherwise prescribed by this Charter* or by the Constitution of the State, the City Commission may by ordinance or resolution prescribe the manner in which any power of the City shall be exercised." (Emphasis added.)

{¶ 20} In opposing this result, Ebner cites several cases as examples where courts have rejected attempts by a municipality to evade mandatory public hearing and notice requirements by passing zoning ordinances under the guise of an emergency. We find the cases to be distinguishable and not persuasive.

{¶ 21} In *Morris v. Roseman*, 162 Ohio St. 447, 123 N.E.2d 419 (1954), the question presented to the court was "whether a noncharter municipality, under the 'home rule' provisions of Section 3, Article XVIII of the Constitution of Ohio, possesses the

14.

power to adopt an emergency zoning ordinance effective immediately, or whether such municipality in adopting a zoning ordinance is governed by [R.C. 713.12], which requires the holding of a public hearing and the giving of a 30-day notice of the time and place of such hearing." The court held that the noncharter village of Oakwood was subject to R.C. 713.12, and thus "the emergency ordinance it attempted to adopt in a manner contrary to such statute was wholly unauthorized and ineffective." *Morris* at 452. Here, however, the City is a charter municipality, and thus the procedure for enacting Ordinance No. 12-107 is derived from the charter and not R.C. 713.12. Therefore, we find *Morris* to be clearly distinguishable.

{¶ 22} Likewise, Ebner's reliance on *Village of Wintersville v. Argo Sales Co., Inc.*, 35 Ohio St.2d 148, 299 N.E.2d 269 (1973), is misplaced. In that case, the Ohio Supreme Court found that a zoning ordinance passed as an emergency ordinance was not valid because the village of Wintersville failed to provide 30-days notice of a public hearing, as required by R.C. 713.12. However, like the village of Oakwood in *Morris*, the village of Wintersville was not a charter municipality. Thus, we find *Wintersville* to be distinguishable.

{¶ 23} Similarly, *Fifth Column, LLC v. Village of Valley View*, 221 F.3d 1334 (Table), 2000 WL 799785 (6th Cir.2000), is inapplicable because that case also involved whether a non-chartered municipality complied with the requirements of R.C. 713.10 and 713.12 when it enacted an emergency ordinance.

15.

**{¶ 24}** Turning to cases that involve a charter municipality, in *State ex rel. Gulf Refining Co. v. De France*, 89 Ohio App. 334, 101 N.E.2d 782 (6th Dist.1950), the petitioner purchased land on which it wanted to build a gas station. Prior to the construction of the gas station, the property was annexed by the city of Toledo. On the same day that the property was annexed, Toledo enacted an emergency zoning ordinance that effectively prohibited the construction of the gas station. The petitioner initiated an original action in this court, seeking a writ of mandamus to compel Toledo to issue a building permit for the gas station. In overruling Toledo's demurrer to the action, this court recognized that authority for zoning ordinances may be derived from a city charter or from the Revised Code. This court found that "[t]he Toledo charter does not specifically enumerate the power to enact zoning regulations but does provide that the city shall have and exercise all powers granted to cities by the Constitution and laws of Ohio." *Id.* at 336-337. Because the Toledo charter did not describe the power to enact zoning regulations, this court concluded, "The authority for the adoption of the ordinance herein involved is therefore derived from the statute rather than from the city charter * * * and must be in accordance with the provisions of [the Revised Code]." *Id.* at 337. In contrast to *De France*, the City's charter in this case does enumerate the power to enact substantive emergency measures, and therefore the authority for Ordinance No. 12-107 arises under the City's charter and not under the Revised Code. Thus, we find *De France* to be distinguishable.

16.

{¶ 25} Ebner next cites *State ex rel. Fairmount Center Co. v. Arnold*, 138 Ohio St. 259, 34 N.E.2d 777 (1941). In that case, the property owner secured a building permit for a business building, but that permit expired in December 1939 without construction having started. On February 12, 1940, the city of Shaker Heights introduced Ordinance No. 4708 to rezone the property to multiple-family residence use. At the same meeting, Shaker Heights passed emergency Ordinance No. 4709, which provided that no permits shall be issued while any ordinance governing the property is pending before the council or city planning commission. Eight days later, the property owner applied for a second permit for the business building. The building inspector refused to issue the permit. *Id.* at 259-261.

{¶ 26} On appeal, the Ohio Supreme Court examined Shaker Heights' charter, which stated,

> "The powers of this city may be exercised in the manner prescribed in this charter, or, to the extent that the manner is not prescribed herein, in such manner as the council may prescribe. *The powers of the city may also be exercised, except as a contrary intent appears in this charter or in the enactments of the council conformably thereto, in such a manner as may now or hereafter be provided by the general law of Ohio.*" (Italics ours.)

*Id.* at 263. The court also noted that Section 5 of Ordinance No. 4162 provided that "any emergency measure * * * may be passed after one reading." *Id.* The court found that

17.

because neither the charter nor any enactment of council contained a contrary intent, and because Shaker Heights proceeded in the enactment of Ordinance No. 4708 in accordance with R.C. 713.12,[7] "it is clear that in the matter of zoning, council was proceeding under the legislative authority of [the Revised Code]." *Arnold* at 264. Therefore, the court held that Shaker Heights could not,

> dispense with the requisite steps provided by [R.C. 713.12], and thus put into effect the anticipated legislation not only earlier than otherwise permitted put (sic) contrary to the plain mandate of the statute that no such change or amendment shall be made without first submitting the proposed change or amendment to the planning commission for report and giving notice by publication of and holding a public hearing on whether the change or amendment should be made.

*Id.* at 265.

{¶ 27} The distinction between *Arnold* and the present case comes in the treatment of emergency measures in the respective charters. In *Arnold*, the charter did not provide for substantive emergency measures, and Ordinance No. 4162 spoke only to an emergency measure being passed after one reading. Thus, the court concluded that in passing zoning ordinances, Shaker Heights must comply with the procedures of the Revised Code. Because the emergency ordinance in *Arnold* circumvented those

---

[7] In *Arnold*, the Ohio Supreme Court referenced R.C. 713.12's predecessor statute, Section 4366-11 of the General Code.

18.

procedures and retroactively applied Ordinance No. 4708, the court found that it was invalid. Here, in contrast, the City's charter provides for substantive emergency measures not subject to the same procedural requirements as a regular zoning ordinance, and Ordinance 12-107 was passed as such an emergency ordinance. Therefore, we find *Arnold* to be distinguishable.

{¶ 28} Finally, Ebner cites *State ex rel. Osting v. City of Sidney*, 3d Dist. Shelby No. 17-2000-21, 2001 WL 272521 (Mar. 20, 2001). In *Osting*, the city of Sidney passed Ordinance No. A-2203 rezoning certain lots from heavy industrial to community business. In opposition to this ordinance, several individuals initiated a referendum petition to suspend Ordinance No. A-2203. After the referendum petition was filed with the city clerk, Sidney City Council held a special meeting at which it adopted two emergency ordinances. Ordinance No. A-2207, the first emergency ordinance, immediately repealed Ordinance No. A-2203. The second emergency ordinance, Ordinance No. A-2208, instantly rezoned the lots in the same manner as was done in Ordinance No. A-2203. The effect of the emergency ordinances was to block the previously filed referendum petition, and to prevent the filing of any future referendum petitions. *Id.* at *1.

{¶ 29} On appeal, the Third District recognized that Sidney was a charter city, and that pursuant to its authority it enacted code sections providing the requirements and procedures for amending or changing the zoning of lots. *Id.* at *3. The court then found

19.

that Ordinance No. A-2207 effectively repealed Ordinance No. A-2203. *Id.* at *4. However, the court found that Ordinance No. A-2208 did not comply with the provisions of the Sidney Code for the enactment of a zoning ordinance, in that Ordinance No. A-2208 was passed without being first submitted to the Sidney Planning Commission, and without being subject to public notice and hearing. *Id.* Thus, the Third District declared Ordinance No. A-2208 to be invalid. *Id.* at *5.

{¶ 30} We find the decision in *Osting* to be of little weight. The court in *Osting* held that Ordinance No. A-2208 did not comply with the procedural requirements for passing a zoning ordinance under the Sidney Code. Here, however, the issue is not whether Ordinance No. 12-107 complied with the procedural requirements for passing a zoning ordinance under Sandusky Municipal Code 1113.02, et seq.—the parties agree that it did not—instead, the issue is whether Ordinance No. 12-107 could be passed as a valid emergency ordinance without meeting those requirements. Even though the ordinance in *Osting* was passed as an emergency measure, the Third District did not consider the issue, and did not examine the Sidney charter or the Sidney Code for any provision regarding an emergency ordinance. Therefore, we do not find *Osting* to be particularly instructive in the present case.

{¶ 31} Contrary to the position of Ebner and the amici, we note that there have been instances where courts have upheld an emergency ordinance that was passed without complying with the public notice and hearing requirements. For example, in

20.

*State ex rel. Davis Inv. Co. v. City of Columbus*, 175 Ohio St. 337, 194 N.E.2d 859 (1963), the Ohio Supreme Court upheld an emergency ordinance that amended the rules for granting a variance. In that case, the property owner owned seven acres of land that was classified as a suburban residential district. Wanting to build a shopping center on the land, the property owner sought a variance pursuant to Section 3309.06(b) of the Columbus City Codes. *Id.* at 338. While the variance was before the Board of Zoning Adjustment, the Columbus City Council adopted Ordinance No. 618-60 as an emergency measure without notice. Ordinance No. 618-60 amended Section 3309.06, and effectively mandated the denial of the property owner's variance application. *Id.* Prior to the amendment, Section 3309.06(b) allowed the Board of Zoning Adjustment to grant a variance in a residential district for a use that would be authorized in a commercial district, subject to certain conditions. *Id.* at 339. After the amendment, Section 3309.06 removed the language in subsection (b), and specifically provided that "Nothing herein shall be construed as authorizing the board to effect changes in the zoning map, or to add to the uses permitted in any district." *Id.* at 340. In a mandamus action before the Ohio Supreme Court, the court recognized that the city of Columbus was a charter city, and Section 22 of the charter provided for "emergency measures 'for the immediate preservation of the public peace, property, health or safety.'" *Id.* at 341. The court concluded that "within the terms of the Columbus charter [the Council of the City of Columbus] was in the lawful exercise of its prerogatives in enacting the legislation which

21.

tied the hands of the board in reference to allowing relator to use its 7.3 acres for commercial purposes." *Id.* at 342.

{¶ 32} Likewise, in *Taylor v. London*, 88 Ohio St.3d 137, 723 N.E.2d 1089 (2000), the Ohio Supreme Court upheld emergency ordinances that annexed certain parcels of land. In that case, the London City Council passed two ordinances accepting applications for annexation. On February 17, 1998, several citizens filed referendum petitions, requesting that those two ordinances be placed on the ballot at the next general election. Two days later, in response to the referendum petitions, the London City Council passed four emergency ordinances. Of the four emergency ordinances, the first two repealed the previous ordinances accepting the applications for annexation. The second two accepted the applications for annexation of each parcel of land to the city of London. *Id.* at 137-138.

{¶ 33} On appeal, the Ohio Supreme Court recognized that the procedures for annexation petitions is set forth in R.C. Chapter 709. *Id.* at 139. Some of those procedures include filing a petition with the board of county commissioners, and the holding of a public hearing. If the petition is approved by the commissioners, the petition and a transcript of the proceedings must be presented to the legislative authority of the municipal corporation, which may then accept or reject the application for annexation by resolution or ordinance. *Id.* at 139-140, citing R.C. 709.02, et seq. The appellants in *Taylor* argued, in part, that R.C. 709.10 prohibited the city of London from accepting

22.

annexation applications through emergency legislation.  In rejecting this argument, the Ohio Supreme Court reasoned that although R.C. 709.10 provides that "annexation shall become effective thirty days after the passage of the resolution or ordinance * * * accepting annexation," it was not irreconcilable with R.C. 731.30, which provides that emergency ordinances take effect immediately.  *Id.* at 142.  The court resolved the conflict between the two statutes by holding "an emergency ordinance accepting annexation becomes effective immediately in accordance with R.C. 731.30 but citizens living in the area annexed do not secure rights and privileges until thirty days thereafter in accordance with R.C. 709.10."  *Id.*  The court explained that "the delay set forth in R.C. 709.10 provides time for the finalization of the annexation * * * and also allows time for the municipality to arrange for extension of its services to the newly annexed area, *e.g.*, garbage collection, police patrol, fire protection, water, and sewer."  *Id.*  The court concluded that "[i]f the General Assembly had intended * * * to prohibit municipalities from passing annexation applications by means of emergency ordinances, it would have stated so in the statutory procedures for annexation.  However, no such language exists in R.C. 709.10, or anywhere in R.C. Chapter 709."  *Id.* at 143.  Thus, the Ohio Supreme Court held, in part, that "the enactment of emergency legislation by a municipality accepting an application for annexation of real estate is not prohibited by R.C. 709.10."  *Id.*

23.

{¶ 34} We find *Davis Inv. Co.* and *Taylor* to be instructive. In *Davis Inv. Co.*, the Ohio Supreme Court recognized the authority of a charter municipality to pass emergency measures without notice pursuant to its charter. Here, Section 14 of the City's charter similarly grants the authority to pass emergency measures. In *Taylor*, the Ohio Supreme Court tacitly affirmed that an emergency measure does not have to comply with the substantive procedural requirements for ordinances concerning the same subject matter. Similar to *Taylor*, nothing in the City's charter, the Sandusky Municipal Code, or even R.C. 713.06, et seq., prohibits the City from passing a zoning ordinance by means of an emergency measure. Therefore, we hold that pursuant to the terms of the City's charter, the City was not required to comply with the public notice and hearing requirements of Sandusky Municipal Code Sections 1113.02, et seq., before it passed Ordinance No. 12-107 as an emergency measure.[8] Consequently, Ordinance No. 12-107 was validly enacted.

---

[8] As a final matter on this issue, we note that both parties cite our decision in *Snyder v. City of Bowling Green*, 6th Dist. Wood No. WD-96-036, 1996 WL 715426 (Dec. 13, 1996). In that case, the Bowling Green City Council adopted ordinance number 5821 as an emergency measure to rezone certain property from agricultural to light industrial. Snyder challenged the ordinance, arguing that it failed to set forth any reason for the emergency nature of the ordinance. *Id.* at *1. Analyzing the text of the emergency justification, this court determined that the ordinance "failed to apprise voters that their representatives did have valid reasons for the necessity of declaring that the ordinance was an emergency." *Id.* at *3. In so determining, this court followed a long line of cases that stand for the proposition that "purely conclusory, tautological, or illusory language in an emergency measure does not meet the requirements for a valid [emergency] ordinance." *Id.* at *2, quoting *State ex rel. Waldick v. Williams*, 74 Ohio St.3d 192, 195, 658 N.E.2d 241 (1995); *see also State ex rel. Webb v. Bliss*, 99 Ohio St.3d 166, 2003-Ohio-3049, 789 N.E.2d 1102, ¶ 14 ("[T]he statutory duty to set forth reasons for an

**{¶ 35}** We are not insensitive to the arguments of Ebner and the amici that such a holding provides municipalities a loophole through which they may circumvent procedural safeguards by simply declaring the matter an emergency. However, this concern has long been tolerated in Ohio. As stated in *State ex rel. City of Fostoria v. King*, 154 Ohio St. 213, 220-221, 94 N.E.2d 697 (1950),

> It may seem strange to sustain legislation as emergency legislation not subject to referendum, where there is in fact no emergency, or where the reasons given for the necessity and for declaring the emergency do not appear to be valid reasons. However, as does Section 4227-3, General Code, provisions for emergency legislation usually safeguard referendum rights by requiring substantially more than a majority vote to enact

emergency in an ordinance is mandatory. Hence, the failure to do so, for example, by including purely conclusory, tautological, or illusory language in the emergency measure fails to meet the R.C. 731.30 requirements for a valid emergency ordinance."). Nevertheless, this court held that because no referendum petition was filed, the ordinance went into effect as a regular ordinance. *Id.* at *3.

Upon review, we do not find *Snyder* to be particularly applicable to the present case. The facts in *Snyder* do not provide any insight into whether certain procedural requirements of public notice and hearing were complied with before the ordinance was passed as an emergency measure. Thus, the case is of limited utility in addressing Ebner's argument that emergency measures must still comply with those procedural requirements. Instead, *Snyder* focuses on the adequacy of the justification for the emergency declaration, citing a line of cases which address that issue. However, Ebner expressly does not make that argument, stating in his reply brief that "Ebner is not asking this Court to review the existence of an emergency. Instead, Ebner argues that, even if the City had properly raised an emergency, it could not use that emergency to flout its own pre-enactment procedures." Therefore, we do not rely on *Snyder* in reaching our decision.

25.

emergency legislation. The statutory requirement of stating reasons for declaring the emergency is provided only to satisfy voters that their representatives did have valid reasons for the necessity of declaring that the ordinance was an emergency. If there was in fact no emergency or if the reasons given for such necessity are not valid reasons, the voters have an opportunity to take appropriate action in the subsequent election of their representatives. However, the existence of an emergency or the soundness of such reasons is subject to review only by the voters at such a subsequent election of their representatives. They are not subject to review by the courts.

Thus, the Ohio Supreme Court points to the ballot box as the appropriate remedy for any abuse of emergency measures.

### 2. Ordinance No. 17-088

{¶ 36} Ebner next argues that Ordinance No. 17-088 was not validly enacted in accordance with the relevant provisions of the Sandusky Municipal Code, which include:

**1113.01 INTENT**

(a) This Zoning Code and the Zone Map may be amended periodically in order to keep it abreast of new zoning techniques, as well as when the following general conditions arise:

(1) Whenever a general hardship prevails throughout a given district; and

(2) Whenever a change occurs in land use, transportation, or other sociological trends, either within or surrounding the community; and

(3) Whenever extensive developments are proposed that do not comply but would be in the public interest.

(b) Such amendments shall be made in accordance with the legislative procedures set forth below.

**1113.02 INITIATION OF CHANGE**

Whenever the public necessity, general welfare, or good zoning practice require, the Planning Commission may propose by motion to amend, supplement, or change these regulations or the zoning district of property within the City.  A proposed change of the Zoning Code or the Zone Map may be initiated by the Planning Commission, the legislative body, or the owner or agent of an owner of the property to which the change would apply.  If the application is made by a person other than the owner, it shall be accompanied by a verified statement by the owner that the person making the application is authorized to make the application.  If initiated by the legislative body, the owner, or agent of the owner, the

amendment shall be referred to the Commission before action is taken by the legislative body.

### 1113.03 ACTION BY PLANNING COMMISSION

The Planning Commission may at its discretion hold a public hearing. However, at this level, a public hearing is not required because the Planning Commission's approval or denial is to be made solely on the facts and not testimony. Whether a hearing is held or not, the Planning Commission is required to make its recommendation and report to the City Commission within thirty (30) days after the first regular meeting subsequent to the receipt of the application. If a hearing is held, notice of the time, place, and purpose of the hearing shall be given by both of the following methods:

(a) Publication at least once in a newspaper of general circulation in the City at least fifteen (15) days prior to the date of the hearing;

(b) A printed notice, not less than ten (10) days prior to the date of the hearing, sent to the owners of all property as shown upon the records of the County Recorder, within three hundred (300) feet of the area proposed to be changed.

(c) The Planning Commission may approve or disapprove the amendment, either in whole or in part, and then submit a recommendation

28.

to the legislative body. In the event the Planning Commission shall fail to act within a thirty (30) day period, unless time is extended by the legislative body, then lack of action shall constitute Commission approval of the amendment.

### 1113.04 ACTION BY LEGISLATIVE BODY

(a) After receiving the above recommendation, or after the thirty (30) day period of inaction, the City Commission shall set a date for a public hearing. In a newspaper of general circulation in the City, notice of the time and place of the meeting shall be given at least (30) days prior to the meeting. During the thirty (30) day period, the text or copy of the text of the ordinance, measure, or regulation, and the maps, plans, and reports submitted by the Planning Commission shall be on file, for public examination, in the office of the Clerk of the Planning Commission.

(b) After the hearing, the legislative body may approve in whole or in part by majority vote of its entire membership, the recommendations submitted by the Planning Commission. The legislative body may disapprove or modify the recommendations by the Planning Commission by a vote of not less than three-fourths of its entire membership.

{¶ 37} The facts pertaining to the enactment of Ordinance No. 17-088 are undisputed. On May 17, 2016, and February 15, 2017, the City held public information

29.

meetings about proposed changes to the regulation of short-term or transient rentals. Ebner attended both of those meetings. On February 28, 2017, the City submitted to the Planning Commission an application to amend the city code. Included with the application was a report from the Planning Department, which explained the factual basis for the amendment, and which contained a copy of the proposed text of the ordinance.

{¶ 38} The Planning Commission held a public meeting and approved the proposed changes on March 8, 2017. Notice of the March 8, 2017 meeting had been sent on February 17, 2017. Ebner attended the March 8, 2017 meeting. At that meeting, the Planning Commission voted unanimously to recommend the proposed text of the ordinance, with one modification to repeal the definition of "non-transient." The modification did not change the basic rule that transient rentals in residential areas would continue to be prohibited.

{¶ 39} On March 13, 2017, the City voted to set a public hearing on April 24, 2017, for its proposed changes to the city code. Notice of the April 24, 2017 hearing was published on March 20, 2017, in a local newspaper. The public notice stated that further details and information regarding the proposed zoning changes could be obtained from the Assistant Planner.

{¶ 40} The final text of the proposed ordinance and the Planning Commission's recommendation regarding that ordinance were prepared on April 12, 2017. The Planning Commission's recommendation was transmitted to the City on April 19, 2017.

The final text of the proposed ordinance no longer contained a definition for "non-transient," and altered the definition of "transient occupancy."

{¶ 41} A public hearing on the proposed ordinance was held before the City Commission on April 24, 2017. Ebner attended that hearing. On May 8, 2017, the City Commission unanimously passed Ordinance No. 17-088.

{¶ 42} Based upon the above facts, it is clear that the City did not strictly comply with the Sandusky Municipal Code. The Sandusky Municipal Code contemplates that the City Commission will not take any action on a proposed zoning regulation until either a recommendation has been submitted by the Planning Commission, or 30 days have passed without any recommendation by the Planning Commission. Once either of those two triggering events occurs, then the City Commission "shall set a date for a public hearing," giving at least 30 days public notice. SMC 1113.04. During those 30 days, the text of the ordinance, and any maps, plans, or reports submitted by the Planning Commission "shall be on file, for public examination, in the office of the Clerk of the Planning Commission." *Id.*

{¶ 43} Here, the City Commission did not wait until it received the recommendation from the Planning Commission—nor did it wait until after the 30-day period of inaction—to set a date for a public hearing. Instead, the City Commission acted quickly, and on March 13, 2017, scheduled a public hearing on the proposed change for April 24, 2017. Thus, pursuant to SMC 1113.04, the text of the ordinance, and the maps,

31.

plans, or reports submitted by the Planning Commission must have been on file, for public examination, no later than March 25, 2017. However, the final text of the ordinance and the Planning Commission report were not prepared until April 12, 2017. Therefore, at best, the text of the ordinance and the maps, plans, or reports submitted by the Planning Commission, were only available for review for 12 days prior to the public hearing.

{¶ 44} In briefing before this court, Ebner cites several Ohio Supreme Court cases that recognize that compliance with the analogous Revised Code section is mandatory. *See Wintersville*, 35 Ohio St.2d at 152, 299 N.E.2d 269 ("[W]ith respect to the procedure to be followed in the adoption of zoning ordinances, it was mandatory to adhere to the provisions of R.C. 713.12, which necessitate a public hearing, preceded by a 30-day notice of the time and place of such public hearing."); *Morris*, 162 Ohio St. at 451-452, 123 N.E.2d 419 ("Since the noncharter village of Oakwood was subject to the statutory enactments with respect to the procedure to be followed in the adoption of zoning ordinances, it was required to follow the provisions of Section 4366-11, General Code, Section 713.12, Revised Code, which necessitated a public hearing preceded by a 30-day notice thereof, and the emergency ordinance it attempted to adopt in a manner contrary to such statute was wholly unauthorized and ineffective."); *Arnold*, 138 Ohio St. at 266, 34 N.E.2d 777. Ebner further recognizes the general principal that "[z]oning regulations are in derogation of the common law and deprive a property owner of certain uses of his land

32.

to which he would otherwise be lawfully entitled." *Saunders v. Clark Cty. Zoning Dept.*, 66 Ohio St.2d 259, 261, 421 N.E.2d 152 (1981). Thus, Ebner concludes that strict compliance with the procedural statutes is necessary. Because the City did not provide the full 30 days for public review of the documents, Ebner concludes that Ordinance No. 17-088 was not validly enacted.

{¶ 45} The City, on the other hand, argues that it was not required to strictly comply with its own code provisions, and that substantial compliance is sufficient. Like Ebner, the City cites several cases in support.

{¶ 46} Upon our review of the case law, we agree with the City's general proposition that substantial compliance with procedural requirements is sufficient for the valid enactment of a zoning ordinance. However, we hold that the City did not substantially comply with its own procedural requirements in this case.

{¶ 47} In *Swickrath & Sons, Inc. v. Village of Elida*, 3d Dist. Allen No. 1-03-46, 2003-Ohio-6288, ¶ 15, the Third District recognized that "[c]ourts have repeatedly held that the requirements of a procedural statute are met when the municipality substantially complies with the statute's procedural mandates, which requires the municipality to act in a way to achieve the purpose of the statute." In that case, public notice of the hearing to discuss the zoning ordinance was required to be published in a newspaper of general circulation pursuant to R.C. 713.12. No such notice was published. Instead, the village made public postings in at least five locations, providing the time, place, and purpose of

33.

the hearing. In addition, the village had the same information printed on each resident's water bill for the month preceding the hearing. *Id.* at ¶ 19. The Third District found that "this individualized notice served the same purpose as the publication in the newspaper of general circulation would have served." *Id.* The Third District also noted that the notice was effective as village residents, including the Swickraths, attended the hearing, and there was no evidence that the rights of any property owners were prejudiced, or that any village resident was precluded from commenting on the proposed zoning. *Id.* at ¶ 20. Thus, the Third District held that the notice of the hearing was in substantial compliance with the requirements of R.C. 713.12. *Id.*

{¶ 48} In *U.S. Cement Co. v. Poland Twp. Bd. of Trustees*, 7th Dist. Mahoning No. 91 C.A. 72, 1994 WL 650238 (Nov. 17, 1994), the Seventh District examined notices of public hearings before the zoning commission and before the township board of trustees that contained several statutory defects under R.C. 519.12. In particular, the notices did not contain the name of the zoning commission addressing the hearing, failed to include the times when the maps would be available for an inspection, and failed to state that the trustees would consider the amendments after the hearing. *Id.* at *3. Nonetheless, the Seventh District held that the notices substantially complied with the statute, the purpose of which it identified was to "provide notice of the hearing to all interested parties." *Id.*, citing *Andrews v. Diefenbach*, 175 Ohio St. 120, 191 N.E.2d 815 (1963). The court found that nothing in the record demonstrated that any interested party

did not have notice of the proceedings, and that the appellants were not prejudiced since they were present and represented by counsel at the hearings. *Id.*

{¶ 49} The City also cites *Schlagheck v. Winterfield*, 108 Ohio App. 299, 307-308, 161 N.E.2d 498 (1958), in which this court held that there was no prejudicial error in the failure of a published notice to include the place and time at which the text and maps of a zoning resolution might be examined as required by R.C. 519.06. R.C. 519.06 applies to township zoning commission hearings, and provides,

> Before certifying its recommendations of a zoning plan to the board of township trustees, the township zoning commission shall hold at least one public hearing, notice of which shall be given by one publication in one or more newspapers of general circulation in the township at least thirty days before the date of such hearing. The notice shall state the place and time at which the text and maps of the proposed zoning resolution may be examined.

This court found that aside from the defective notice before the township zoning commission, all other procedural steps set forth in R.C. Chapter 519 were followed incident to the adoption of the zoning resolution. *Schlagheck* at 308. Further, in addition to noting that appellants had not even raised the notice issue as a separate assignment of error, this court found that the appellants were not prejudiced because they were represented by counsel "at the several proceedings before the planning commission, the

35.

zoning commission and the board of trustees, and no objection was made regarding such defect at the public hearing held by such board." *Id.*

{¶ 50} In *White v. City of Parma*, 8th Dist. Cuyahoga No. 49539, 1985 WL 8635 (Sept. 26, 1985), the Whites challenged the validity of an ordinance originally enacted in 1931, nearly 50 years before they purchased their property. The Whites argued that there was no indication that 30-days notice was given before a public hearing on the ordinance. *Id.* at *3. In rejecting the Whites' appeal, the Eighth District noted that the limited records before it did not conclusively establish whether a public meeting was held before the ordinance was passed. However, the court found that it was apparent that the planning commission worked on the ordinance for almost one year, and that the citizens were notified of the proposed ordinance nearly one year before it was enacted. *Id.* at *2. The Eighth District held that, in the absence of evidence to the contrary, it "[was] presumed that the necessary procedures for legal adoption of legislation were followed." *Id.* at *3. Thus, the court refused to invalidate the 1931 ordinance. *Id.*

{¶ 51} Finally, in *Andrews v. Diefenbach*, 175 Ohio St. 120, 191 N.E.2d 815 (1963), the Ohio Supreme Court upheld Lucas County's approval of an annexation petition where the statutory notice requirements were not strictly followed. In that case, R.C. 707.05 required that notice of the hearing was to be published "for a period of six consecutive weeks," but the notice was posted for only 40 days, not 42. *Id.* at 121-122. In addition, R.C. 707.05 required that the hearing shall be held "not less than sixty days"

36.

after the petition was filed with the county auditor, but the hearing was held after only 46 days.  *Id.*  The Ohio Supreme Court reasoned that "[t]he only apparent purposes for the foregoing statutory requirements would be to provide notice of the hearing to all interested parties so that they would have ample time to prepare for the hearing."  *Id.* at 122.  The court found that "there is nothing in the record to indicate that those purposes have not been fully satisfied," noting that, at the hearing, "much testimony was presented by both proponents and opponents of the proposed annexation but no objection was made by anyone about the notice or about the time of the hearing."  *Id.*

{¶ 52} All of the cases relied upon by the City are distinguishable from the present situation.  *Schlagheck* and to a partial extent *U.S. Cement* involved preliminary proceedings before the planning commission, which we find to be meaningfully different from the present case involving final proceedings before the legislative authority. *Andrews* involved annexation proceedings, which do not directly impose the same restrictions on the use of private property as do zoning regulations.  *White* involved a challenge to a 50-year old ordinance where there no longer existed good records of the proceedings and it was presumed that the proper legislative process was followed. Finally, the remaining case, *Swickrath*, exemplifies the fundamental difference between all of the above cited cases and the matter before us.

{¶ 53} In *Swickrath*—and *Andrews*, *Schlagheck*, and *U.S. Cement*—the issue before the court was the sufficiency of the notice, and the question the court resolved was

37.

whether the fundamental purposes of the statutes providing for notice were satisfied. The court in *Swickrath* identified the purpose of the notice requirement in R.C. 713.12 as "to provide notice of the proceedings to the public because actions of the legislative authority may affect their rights." *Swickrath*, 3d Dist. Allen No. 1-03-46, 2003-Ohio-6288, at ¶ 15. Likewise, *Andrews* identified the purpose of the notice requirement in R.C. 707.05 as "to provide notice of the hearing to all interested parties so that they would have ample time to prepare for the hearing." *Andrews*, 175 Ohio St. at 122, 191 N.E.2d 815; *see also U.S. Cement*, 7th Dist. Mahoning No. 91 C.A. 72, 1994 WL 650238, at *3 (citing *Andrews* in finding that "[t]he purpose of the statute is to provide notice of the hearing to all interested parties"). In those cases, the courts found that because the interested parties knew about the hearings and were present at them, the purposes of the statutes were satisfied.

{¶ 54} Here, however, the issue is not with the sufficiency of the notice and whether Ebner knew to show up at the April 24, 2017 hearing. Instead, the issue is whether Ebner had access to all of the relevant material for a sufficient time before the hearing. To that end, SMC 1113.04(a) requires, "During the thirty (30) day period, the text or copy of the text of the ordinance, measure, or regulation, and the maps, plans, and reports submitted by the Planning Commission shall be on file, for public examination, in the office of the Clerk of the Planning Commission." Ebner correctly identifies that such a requirement "is designed to safeguard property rights and to give property owners a fair

38.

opportunity to enter a protest against an ordinance or regulation which may materially interfere with the use of their property or decrease its value." *Morris*, 162 Ohio St. at 450-451, 123 N.E.2d 419.

{¶ 55} As to whether the City substantially complied with SMC 1113.04(a), Ebner argues that because the text of the ordinance and the Planning Commission's recommendation and report were not prepared until April 12, he did not have a fair opportunity to enter a protest against the ordinance. The City, on the other hand, argues that Ebner had access to the materials supporting the Planning Commission's recommendation for at least 30 days before April 24. Those materials included a February 28, 2017 report from the Planning Department, which explained the factual basis for the amendment and contained a copy of the proposed text of the ordinance. In addition, Ebner was present at the March 8, 2017 Planning Commission hearing where the report from the Planning Department was discussed, and the decision was made to recommend the report with one modification to repeal the definition of "non-transient." Ebner also had access to the notes and audio taken from the March 8, 2017 hearing. Thus, the City concludes that Ebner suffered no prejudice in his effort to protest against the ordinance. In response, Ebner counters that the Planning Department report, and the notes and audio from the March 8, 2017 hearing, are not a substitute for the text of the ordinance and the Planning Commission's recommendation and report.

39.

**{¶ 56}** We agree with Ebner that the City did not substantially comply with SMC 1113.04(a). SMC 1113.04 identifies that the matter before the City Commission is the report and recommendation of the Planning Commission, and provides that only a majority of the City Commission is required to approve of the Planning Commission's recommendation, whereas three-fourths of the City Commission is required to disapprove or modify the Planning Commission's recommendation. SMC 1113.04(b). Because the matter at issue is the Planning Commission's recommendation, we think it is imperative that the recommendation itself is available for review. Thus, we reject the City's argument that having knowledge of the underlying facts and reports is sufficient to satisfy the requirement. Furthermore, we find that, at best, the recommendation was available for review for only 12 days before the hearing, which is 40 percent of the required 30 days. We can envision a scenario in which making the recommendation available for less than 30 days is a de minimis violation that still constitutes substantial compliance, but 12 out of 30 days is not such a case. Therefore, we hold that the City failed to substantially comply with SMC 1113.04(a) when it enacted Ordinance No. 17-088, and thus that ordinance is invalid.

### B. Whether the Ordinances are Constitutional

**{¶ 57}** Ebner next argues that Ordinance Nos. 12-107 and 17-088 are unconstitutional. Because we held that Ordinance No. 17-088 is invalid, we will not address the constitutionality of that ordinance since "courts decide constitutional

40.

questions only when 'absolutely necessary.'" *State ex rel. BSW Development Group v. City of Dayton*, 83 Ohio St.3d 338, 345, 699 N.E.2d 1271 (1998), quoting *Norandex, Inc. v. Limbach*, 69 Ohio St.3d 26, 28, 630 N.E.2d 329 (1994); *Hall China Co. v. Public Utilities Commission*, 50 Ohio St.2d 206, 210, 364 N.E.2d 852 (1977) ("Ohio law abounds with precedent to the effect that constitutional issues should not be decided unless absolutely necessary.").

{¶ 58} Focusing on Ordinance No. 12-107, we begin with the rule that properly enacted zoning ordinances "are entitled to a 'strong presumption of constitutionality,' and the individual asserting the unconstitutionality of a statute 'bears the burden of proving that the law is unconstitutional beyond a reasonable doubt.'" *Viviano v. Sandusky*, 2013-Ohio-2813, 991 N.E.2d 1263, ¶ 11 (6th Dist.), quoting *Yajnik v. Akron Dept. of Health, Hous. Div.*, 101 Ohio St.3d 106, 2004-Ohio-357, 802 N.E.2d 632, ¶ 16; *Leslie v. City of Toledo*, 66 Ohio St.2d 488, 489-490, 423 N.E.2d 123 (1981) ("[T]he party challenging a zoning ordinance, has the burden of demonstrating the unconstitutionality of such an ordinance. * * * Zoning ordinances, enacted pursuant to a municipality's police powers, are presumed valid until the contrary is clearly shown by the party attacking the ordinance.").

### 1. Void for Vagueness

{¶ 59} Ebner first argues that Ordinance No. 12-107 is void for vagueness. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions

are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). "To pass muster under the void-for-vagueness doctrine, Ohio law dictates that an ordinance must survive the tripartite analysis set forth in *Grayned*[:] * * * (1) the ordinance must provide fair warning to the ordinary citizen of what conduct is proscribed, (2) the ordinance must preclude arbitrary, capricious, and discriminatory enforcement, and (3) the ordinance must not impinge constitutionally protected rights." *Viviano* at ¶ 15, citing *Grayned* at 108-109.

{¶ 60} *Viviano* is particularly relevant to this case because it involves the precursor to Ordinance No. 12-107. In that case, as here, Viviano owned a house located on Cedar Point Road on the Cedar Point Chaussee, which he used as a short-term rental property. Viviano received a cease and desist order from the City, alleging that his short-term rentals violated the Sandusky Municipal Code, and constituted misdemeanors of the fourth degree. Thereafter, Viviano challenged as unconstitutionally vague the ordinances that limited the use of his property to "one-family dwellings," and which defined "dwelling" as a "building designed or occupied exclusively for non-transient residential use (including one-family, two-family, or multifamily buildings)." [9] *Id.* at ¶ 4. In evaluating the ordinances under the three prongs of the *Grayned* test, this court first

---

[9] Ebner was a party to the litigation along with Viviano. In *Ebner v. Sandusky*, 6th Dist. Erie No. E-12-057, 2013-Ohio-2475, ¶ 12, which was decided two weeks before *Viviano*, this court similarly affirmed the trial court's judgment that the ordinances were unconstitutionally vague. The decisions in *Ebner* and *Viviano* do not reference one another.

found that the use of the disjunctive "or" in defining a dwelling would lead a person of ordinary intelligence to reasonably believe that having a house that was either "designed *or* occupied exclusively for non-transient rental use" would be sufficient under the zoning ordinances. (Emphasis added.) *Id.* at ¶ 17. Thus, this court found that the ordinances did not satisfy the first prong of *Grayned*. *Id.* Turning to the second prong, this court found that the term "non-transient" was not defined in the ordinances and did not lend itself to a plain and unambiguous meaning. *Id.* at ¶ 19. Looking at the dictionary definition of "transient," this court remarked that it only provided an equally imprecise standard of "brief." *Id.* at 20. This court reasoned that

> [a]bsent a time scale, the term is rendered entirely subjective and incapable
> of providing guidance to either the citizen or the enforcing party. * * * In
> this manner, "transient" (and by extension "non-transient") would
> encompass not only rentals, but month-to-month leases, vacation homes
> used sporadically, and loans of a property to friends. Given a sufficiently
> long timeframe, the zoning board could declare any use of any property by
> any citizen to be "transient."

*Id.* This court found that the subjective nature of the term could lead to arbitrary application, and thus the ordinance violated the second prong of *Grayned*. *Id.* at ¶ 21. Consequently, this court held that the ordinances were unconstitutionally vague. *Id.* at ¶ 22.

43.

{¶ 61} While *Viviano* was pending, the City enacted Ordinance No. 12-107 as an emergency measure. Ordinance No. 12-107 deleted the phrase "designed or" from the definition of dwelling, with the resulting definition being "a building occupied exclusively for non-transient and residential use." *Kinzel v. Ebner*, 2020-Ohio-4165, 157 N.E.3d 898, ¶ 9 (6th Dist.). Ordinance No. 12-107 also defined "non-transient" to mean "a period of not less than 365 days," and defined "transient occupancy" to mean "occupancy when it is the intention of the parties that the occupancy will be temporary. There is a rebuttable presumption that, when the dwelling unit occupied is not the sole residence of the guest, the occupancy is transient." *Id.*

{¶ 62} In the present appeal, Ebner argues that Ordinance No. 12-107 is unconstitutionally vague in that the definition of "non-transient" describes a yearly use, not a non-transient use. Ebner contends that "non-transient" cannot be understood to mean a period of 365 days or more. Further, Ebner emphasizes that the term "transient occupancy" uses the ambiguous standard of "temporary," which does not provide an actual length of time, and that the definition of "transient occupancy" contradicts the definition of "non-transient" because a period of up to 364 days is not temporary.

{¶ 63} Applying the three prongs of the *Grayned* test, we conclude that Ordinance No. 12-107 is not unconstitutionally vague. First, the ordinance provides fair warning to the ordinary citizen that in a residential area zoned for single-family dwellings, the building must be occupied exclusively for non-transient and residential use. Non-

44.

transient means a period of not less than 365 days. Thus, the building must be occupied exclusively for periods of one year or more. Attempting to introduce ambiguity to the definition, Ebner cites the testimony of one of the City's witnesses that the 365-day term "is not * * * logical * * * doesn't make sense." However, the witness's testimony clearly conveys that she thinks it is imprudent to define non-transitory in such a manner; the testimony does not convey that she does not understand how the term was defined. Notably, the City Commission evidently agreed that the 365-day requirement was too long, and attempted to amend the definition in Ordinance No. 17-088. Nevertheless, we are not tasked to determine whether the ordinance was wise or unwise, only whether it was understandable to an ordinary citizen. In this case, we find that it is clear that non-transient occupancy means an occupancy for 365 days or more. Therefore, we find that the first *Grayned* prong is satisfied.

{¶ 64} Under the second prong, the ordinance must preclude arbitrary, capricious, and discriminatory enforcement. We find that it does. Unlike the predecessor statute in *Viviano*, which left the definition of non-transient to the whims of the commission, here the term non-transient is given a fixed, certain definition of not less than 365 days. Thus, any residential occupancy that is less than 365 days is in violation of the ordinance. Therefore, we find that the second *Grayned* prong is satisfied.

{¶ 65} Finally, under the third prong, Ebner argues that Ordinance No. 12-107 impinges his constitutionally protected rights in that the vagueness of the ordinance

45.

violates his right to due process, and the arbitrary enforcement of the ordinance violates his right to equal protection.  Because we found above that the statute is not vague and does not lend itself to arbitrary enforcement, we reject Ebner's arguments that his constitutional rights were impinged.  Therefore, we find that the third *Grayned* prong is satisfied.

{¶ 66} Accordingly, we hold that Ordinance No. 12-107 is not unconstitutionally vague.

## 2. Whether Ordinance No. 12-107 is Unconstitutional on its Face

{¶ 67} Ebner next argues that Ordinance No. 12-107 is unconstitutional because it lacks a rational relationship to any legitimate governmental purpose.

{¶ 68} "Zoning is a valid legislative function of a municipality's police powers." *Jaylin Investments, Inc. v. Moreland Hills*, 107 Ohio St.3d 339, 2006-Ohio-4, 839 N.E.2d 903, ¶ 10, citing *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926).  "Courts should not interfere with zoning decisions unless the municipality exercised its power in an arbitrary and unreasonable manner and the decision has no substantial relation to the public health, safety, morals, or general welfare."  *Id.*, citing *Euclid* at 394.  "A zoning ordinance may be challenged as unconstitutional on its face or as applied to a particular set of facts."  *Id.* at ¶ 11.  "In a facial challenge to a zoning ordinance, the challenger alleges that the overall ordinance, on its face, has no rational relationship to a legitimate governmental purpose and it may not constitutionally be

46.

applied under any circumstances." *Id.*, citing *State ex rel. Bray v. Russell*, 89 Ohio St.3d 132, 137, 729 N.E.2d 359 (2000). "The burden of proof remains with the party challenging an ordinance's constitutionality, and the standard of proof remains 'beyond fair debate.'" *Id.* at ¶ 13, quoting *Goldberg Cos., Inc. v. Richmond Hts. City Council*, 81 Ohio St.3d 207, 214, 690 N.E.2d 510 (1998). "[T]here is little difference between the 'beyond fair debate' standard and the 'beyond a reasonable doubt' standard." *Cent. Motors Corp. v. Pepper Pike*, 73 Ohio St.3d 581, 584, 653 N.E.2d 639 (1995), citing *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19, 526 N.E.2d 1350 (1988).

{¶ 69} In support of his argument, Ebner points to the testimony of the City Planning Director, who testified that she could not think of any reason that requiring someone to live in a property for 365 days or more relates to the health, safety, or general welfare of the city. In response, the City argues that transient rentals cause issues relating to late night noise and partying, trespassing, traffic congestion, trash and litter, and safety concerns for older residents.

{¶ 70} Upon review, and mindful of the high burden that Ebner carries, we agree with the City that it has a legitimate government interest in the noise, trespassing, traffic, trash, and safety concerns of a neighborhood and its residents. *See id.* at 585 (city may exercise its zoning authority to preserve the character of the area and promote the overall quality of life). Furthermore, we find that the City's prohibition on transient rentals of less than 365 day is rationally related to the promotion of that governmental interest, and

47.

Ebner has not satisfied his burden of demonstrating that there are no circumstances under which Ordinance No. 12-107 could be constitutionally applied. Therefore, we hold that Ordinance No. 12-107 is not unconstitutional on its face.

### 3. Whether Ordinance No. 12-107 is Unconstitutional as Applied

{¶ 71} Ebner alternatively argues that Ordinance No. 12-107 is unconstitutional as applied to his properties. "In an 'as applied' challenge to a zoning ordinance, the landowner questions the validity of the ordinance only as it applies to a particular parcel of property. If the ordinance is unconstitutional as applied under those limited circumstances, it nevertheless will continue to be enforced in all other instances." *Jaylin Investments* at ¶ 12. The standard utilized in an "as applied" challenge is similar to that of a facial challenge: "a zoning regulation is presumed to be constitutional unless determined by a court to be clearly arbitrary and unreasonable and without substantial relation to the public health, safety, morals, or general welfare of the community." *Id.* at ¶ 13, quoting *Goldberg* at syllabus.

{¶ 72} Here, Ebner argues that Ordinance No. 12-107 is unconstitutional as applied because his properties are different from a typical neighborhood. Ebner notes that the City's stated purpose of zoning regulations in residential areas is to prevent noxious fumes, odors, dust, excessive noises, and the invasion of abnormal traffic. However, Ebner argues that his properties abut Cedar Point Amusement Park, which generates loud noises, debris, litter, and an influx of approximately 20,000 guests per day.

48.

Thus, he contends that there is no legitimate public purpose in prohibiting the short-term rental of his properties when those properties are already permeated by the objectionable influences.

{¶ 73} The City, in opposition, argues that although Cedar Point is nearby, the Chaussee has maintained its residential character. Further, the City argues that while Cedar Point does generate noise, transient rentals along the Chaussee cause separate issues such as late night noise and partying, trespassing, traffic congestion, trash and litter, and safety concerns.

{¶ 74} The parties primarily rely on two cases in support of their positions. Ebner cites *Mayfield-Dorsh, Inc. v. City of South Euclid*, 68 Ohio St.2d 156, 157, 429 N.E.2d 159 (1981), in which the Ohio Supreme Court held that the property owners clearly demonstrated, beyond fair debate, that a zoning classification allowing only single or two-family residences was unconstitutional as applied to a 3.45 acre parcel of land. In that case, the property owners sought to have the parcel re-zoned to a "residence-office district" to permit them to construct a 45-unit condominium complex. The City of South Euclid, opposed the project, and proposed using the property for eight single or two-family homes. The Ohio Supreme Court considered that the property owners' proposal would result in only one or two driveways along a busy thoroughfare, whereas the city's proposal would result in eight driveways, thus creating a safety problem. *Id.* at 157-158. The Ohio Supreme Court also considered that the property owners' proposal would be

49.

harmonious with existing zoning of the property forming the western boundary, which was zoned residence-office, and which contained a public library. Adjacent to the library to the west, was another residence-office district that housed a florist, a funeral home, and a medical center. In addition, the area surrounding the 3.45 acre parcel had not maintained its residential character. *Id.* at 158. Finally, the court considered that given the unique topography of the land, any structures would have to be clustered in the center of the property, and that the city's proposal of eight single or two-family homes was not feasible because it envisioned homes being built directly on a flood plain. *Id.* at 159. Therefore, the Ohio Supreme Court held that the residential zoning classification was unreasonable, arbitrary, and not substantially related to the public health, safety, and general welfare. *Id.*

{¶ 75} The City, for its part, cites *Lesley v. Toledo*, 66 Ohio St.2d 488, 423 N.E.2d 123 (1981). In that case, the property owner purchased four lots, and sought to have them rezoned from residential to commercial so that he could construct an office building on the property. The Toledo City Council denied his rezoning request, and the trial court affirmed. On appeal, this court, in a split decision, reversed the trial court, and held that the retention of the residential classification of the property was arbitrary, unreasonable, and bore no substantial relation to the public health, safety, morals, or general welfare of the community. On appeal to the Ohio Supreme Court, the court reversed, and reinstated the decision of the Toledo City Council. The Ohio Supreme Court reasoned that the

50.

property lay in the center of five blocks of a residential neighborhood. *Id.* at 490. The only property within those five blocks that was not residential were two lots east of the fire station, which were zoned commercial. *Id.* Regarding those two lots, the court noted, "the mere existence of some adjacent property devoted to other uses does not destroy the character of restricted property for residential purposes or render the restrictions arbitrary." *Id.*, quoting *Wilkins v. San Bernadino*, 29 Cal.2d 332, 344, 175 P.2d 542 (1946). The court determined that while there were changes along a boundary street of the residential area, and thus there was now "shopping centers, gasoline service stations and other commercial establishments within the general vicinity of the subject property," the residents lived in an exclusively residential area. *Id.* The court concluded that "[t]he city council's decision not to alter the subject property's status from residential to commercial, with the concomitant change in the neighborhood's traffic patterns, is rationally related to several hazards which the city may lawfully regulate pursuant to its police powers: protection of pedestrians and drivers, regulation of traffic congestion and on-street parking, and reduction of air and noise pollution." *Id.* at 491. Therefore, relying on the principle that zoning decisions are committed, in the first instance, to the judgment and discretion of the legislative body, the Ohio Supreme Court held that keeping the residential classification was not "illegal, arbitrary, confiscatory, unconstitutional, nor substantially unrelated to the public health, safety, morals, or general welfare of the community." *Id.* at 491.

51.

{¶ 76} We find that the present situation is more closely aligned to *Lesley* than *Mayfield-Dorsh* for two reasons.  First, unlike *Mayfield-Dorsh*, the prohibition on short-term rentals in this case still results in a viable use of the property.  In *Mayfield-Dorsh*, the court recognized that the proposed use of the property for single-family homes was not feasible because the homes would have to be located on a flood plain.  Here, in contrast, there is no such concern with the non-transient use of the homes.  Second, like *Lesley*, and unlike *Mayfield-Dorsh*, the residential character of the neighborhood has not changed.  The subject area has been zoned single-family residential since at least 1965, and there are no gasoline service stations, shopping centers, or any other commercial establishment within the vicinity other than Cedar Point.  Ebner cites the noise, debris, and influx of visitors from Cedar Point as reasons that his property should be allowed to be used for transient rentals, but those influences existed to some extent long before the properties within Chaussee were first zoned residential nearly six decades ago.  Thus, the present facts are similar to *Lesley* in that there is commercial activity on the boundaries of the neighborhood, but the neighborhood itself is exclusively residential.  Ebner's proposed use of his properties as short-term rental homes would increase the commercial activity in the neighborhood, and would bring with it additional issues of late night noise and partying, trespassing, trash and litter, and safety concerns.  The City has a lawful interest in regulating those concerns, and its prohibition on transient use of the property is rationally related to addressing those concerns.  Therefore, we hold that Ordinance No.

52.

12-107, as applied, is not clearly arbitrary or unreasonable, nor is it without substantial relation to the public health, safety, morals, or general welfare of the community.

{¶ 77} Accordingly, we hold that Ordinance No. 12-107 is not unconstitutional.

## C. Whether Enforcement of the Ordinances Violated Equal Protection

{¶ 78} In his third, and final, assignment of error, Ebner argues that the trial court erred when it awarded summary judgment to the City on his claim that enforcement of Ordinance Nos. 12-107 and 17-088 violated the Equal Protection Clause.

{¶ 79} The Fourteenth Amendment to the United States Constitution provides, in part, "No State shall * * * deny to any person within its jurisdiction the equal protection of the laws." "[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). Notably, "[t]he federal and Ohio equal-protection provisions are 'functionally equivalent' * * * and 'are to be construed and analyzed identically.'" (Internal citations omitted.) *Pickaway Cty. Skilled Gaming, L.L.C. v. Cordray*, 127 Ohio St.3d 104, 2010-Ohio-4908, 936 N.E.2d 944, ¶ 17.

{¶ 80} Instead of demonstrating membership in a protected class, Ebner is proceeding as a "class of one." "'Class of one' plaintiffs have a 'heavy burden' to 'show that they were treated differently than those similarly situated in all material respects,'

53.

and that 'the adverse treatment they experienced was so unrelated to the achievement of any combination of any legitimate purposes that the court can only conclude that the government's actions were irrational.'" *City of Cincinnati v. Fourth National Realty, LLC*, 2017-Ohio-1523, 88 N.E.3d 1278, ¶ 16 (1st Dist.), quoting *Loesel v. City of Frankenmuth*, 692 F.3d 452, 462 (6th Cir.2012). "The lack of a rational basis may be demonstrated in one of two ways: 'either by negativing every conceivable basis for the government's action or by demonstrating that the challenged actions were motivated by animus or ill-will.'" *Id.*, quoting *Loesel* at 462.

{¶ 81} Here, Ebner alleged in his complaint that the City attempted to enforce Ordinance No. 12-107 on several occasions based upon complaints that the City received from the Kinzels. On August 6, 2015, the City sent a notice informing Ebner that "if you are found to be operating a transient rental that is not determined to be a legal non-conforming use, Planning Staff will issue a violation notice and you will be required to discontinue all transient rental at this location." A second warning letter was sent on June 28, 2016, requesting that Ebner cease using the property for short-term rentals. On September 2, 2016 and again on October 7, 2016, the City issued notices of violation to Ebner based on the short-term rentals. Ebner alleged that the City has attempted to formally enforce Ordinance No. 12-107 against him only, and that it has not issued formal notices of violations to similarly situated property owners.

{¶ 82} Ebner further alleged that shortly after Ordinance No. 17-088 was passed, the City began aggressively enforcing the ordinance against him, again based upon the persistent complaints by the Kinzels. Ebner stated that on August 30, 2017, August 31, 2017, and October 21, 2017, the city filed criminal complaints against him for transient rental violations. Ebner alleged that he is the only individual who has received a criminal citation, and that the City has not cited or criminally charged other property owners who also engage in the transient rental of their homes.

{¶ 83} In moving for summary judgment, the City argued that Ebner was not treated differently than others similarly situated. The City pointed to deposition testimony that Ordinance No. 12-107 was also enforced against a different property owner who was engaged in transient rentals of the home. As to the enforcement of Ordinance No. 17-088, the City again cited deposition testimony that notices of transient occupancy violations were sent to eleven other city residents.

{¶ 84} In opposition to the motion for summary judgment,[10] Ebner argued that the City was motivated by animus or ill will based upon Ebner's prior successful lawsuit to prevent the City from enforcing a vague and overbroad ordinance against short-term renters on the Chaussee. Ebner also alleged that two of the City Commissioners maintained ill will against Ebner after they were told that Ebner allegedly lied to Mr. Kinzel about Ebner's proposed use of his property. In addition, regarding the

_____

[10] Only the City, not Ebner, moved for summary judgment on Ebner's equal protection claim.

55.

enforcement of Ordinance No. 12-107, Ebner argued that he was treated differently because the other property owner was only sent a letter of inquiry, whereas he was sent a formal notice of violation. As to the enforcement of Ordinance No. 17-088, Ebner again distinguishes between the criminal complaints that he received and the transient rental notices that the other property owners received.

{¶ 85} In reply in support of its motion for summary judgment, the City argued that the person who received the communication under Ordinance No. 12-107 was treated differently because that person stopped renting the property. The City relied upon Angela Byington's testimony regarding that investigation: "I don't know that they found anything, but there was communication with the owner and they said they wouldn't do it anymore." As to the enforcement of Ordinance No. 17-088, the City again noted that notices of violation were sent to eleven other transient renters under that ordinance.

{¶ 86} Initially, the trial court denied the City's motion for summary judgment, succinctly stating:

> The Ebner Defendants argue that their rights to Equal Protection
> have been violated because they were victims of selective enforcement of
> Ord. No. 12-077 (sic) and Ord. No. 17-088. The City points to evidence in
> the record showing that the City has enforced or attempted to enforce Ord.
> No. 12-077 (sic) and Ord. No. 17-088 against other persons. I find that

56.

there are genuine issues of material fact as to this claim if it is assumed that the jurisdictional priority rule is inapplicable.

{¶ 87} Following our remand from the first appeal, the City moved for reconsideration of its motion for summary judgment on the equal protection claim. The City argued that summary judgment was appropriate because Ebner provided only speculation, not evidence, that there were other similarly situated property owners that the City did not enforce the zoning ordinances against. Furthermore, the City argued that any difference in the enforcement of Ordinance No. 12-107 and Ordinance No. 17-088 was the result of Ebner continuing to use the properties as short-term rentals while the other property owners stopped.

{¶ 88} Ebner opposed the motion for reconsideration, arguing that a genuine issue of material fact existed regarding whether the City treated him differently out of malice or ill will. In support, Ebner cited his prior successful lawsuit, as well as multiple emails that he alleged showed the City Commissioners' vindictiveness towards him based upon the complaints of the Kinzels. In addition, Ebner highlighted that he was the only property owner that suffered long-term investigations and the filing of criminal complaints based upon the zoning ordinances. Ebner also noted that, as to Ordinance No. 17-088, he received a notice of violation shortly after the ordinance was passed, whereas the other property owners did not receive their notices until November 2017, after the summer rental season had ended.

57.

**{¶ 89}** Finally, in its reply in support of the motion for reconsideration, the City argued that Ebner did not demonstrate that the City's actions were motivated by "personal malice unrelated to the defendant's official duties." *Taylor Acquisitions, L.L.C. v. City of Taylor*, 313 Fed.Appx. 826, 837-838 (6th Cir.2009). The City contended that all of the City Commissioners' actions were taken in pursuit of their official duty to enforce the zoning regulations.

**{¶ 90}** Upon our de novo review, we hold that the trial court did not err in awarding summary judgment to the City because Ebner has not demonstrated a genuine issue of material fact that he was treated differently from others similarly situated. "[T]he 'similarly situated' requirement must be rigorously applied in the context of 'class of one' claims." *Leib v. Hillsborough Cty. Public Transp. Comm.*, 558 F.3d 1301, 1307 (11th Cir.2009). Rigorous application is necessary because "unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors." *Jennings v. City of Stillwater*, 383 F.3d 1199, 1211 (10th Cir.2004).

**{¶ 91}** In this case, by citing to the deposition testimony that the ordinances were enforced against other property owners, the City met its initial burden of demonstrating the absence of a genuine issue of material fact that Ebner was treated differently. The burden then shifted to Ebner "to set forth specific facts showing that there is a genuine

issue for trial." *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996), citing Civ.R. 56(E). Ebner failed to meet this burden. Ebner did not identify or provide any evidence of other individuals that were engaged in the transient rental of their properties, but against whom the City did not enforce its zoning ordinances; Ebner only speculated that such individuals existed. Furthermore, Ebner's attempt to emphasize that he was the only property owner who received formal notices of violations or criminal charges fails to demonstrate that he was treated differently than other similarly situated property owners. The evidence shows that upon receiving inquiries or notices, the other property owners stopped renting their properties. Unlike those other property owners, Ebner persisted in his short-term rental of the properties. Thus, Ebner is not "similarly situated" with the other property owners. Therefore, because Ebner has not met his reciprocal burden to demonstrate a genuine issue of material fact that he was treated differently than other similarly situated property owners, we hold that summary judgment in favor of the City on Ebner's equal protection claim is appropriate.

{¶ 92} Accordingly, Ebner's third assignment of error is not well-taken.

### IV. Conclusion

{¶ 93} We hold that Ordinance No. 12-107 was validly enacted and is not unconstitutional. Accordingly, Ebner's first assignment of error is not well-taken.

59.

**{¶ 94}** We hold that Ordinance No. 17-088 was not validly enacted, and thus we do not reach whether it is unconstitutional. Accordingly, Ebner's second assignment of error is well-taken.

**{¶ 95}** Finally, we hold that summary judgment in favor of the City on Ebner's equal protection claim is appropriate. Accordingly, Ebner's third assignment of error is not well-taken.

**{¶ 96}** For the foregoing reasons, we find that substantial justice has not been done the party complaining, and the judgment of the Erie County Court of Common Pleas is affirmed, in part, and reversed, in part. This matter is remanded to the trial court for further proceedings consistent with this decision. The parties are ordered to split evenly the costs of this appeal pursuant to App.R. 24.

Affirmed, in part,
and reversed, in part,
and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.      _____
                                                    JUDGE
Thomas J. Osowik, J.

                                          _____
Gene A. Zmuda, J.                                     JUDGE
CONCUR.

                                          _____
                                                    JUDGE

60.

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.